1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                       FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11   ARTURO AREVALO,                          No.  1:23-cv-00305-SKO (HC)
12                   Petitioner,              **ORDER DENYING PETITION FOR WRIT
                                              OF HABEAS CORPUS, DIRECTING
13        v.                                  CLERK OF COURT TO ENTER
                                              JUDGMENT, AND DECLINING TO ISSUE
14   TAMMY CAMPBELL, Warden,                  CERTIFICATE OF APPEALABILITY**
15                   Respondent.
16
17        Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  All parties having consented to the

19   jurisdiction of a magistrate judge, this matter was assigned to the undersigned pursuant to 28

20   U.S.C. § 636(c)(1) for all purposes including entry of final judgment. (Doc. 6, 11, 12.)

21        Petitioner has filed the instant petition challenging his convictions of rape of a woman and

22   sexual molestation of two minors.  As discussed below, the Court finds the claims to be without

23   merit and will **DENY** the petition.

24   **I.        PROCEDURAL HISTORY**

25        On April 15, 2019, Petitioner was convicted by jury trial in the Kern County Superior

26   Court of one count of rape of a victim unconscious of the nature of the acts in violation of Cal.

27   Penal Code § 261(A)(4), one count of rape by force or fear in violation of Cal. Penal Code §

28   261(A)(2), two counts of lewd and lascivious acts with a child under 14 years of age in violation

                                               1

of Cal. Penal Code § 288(A).  (Doc. 13-2 at 114, 116.[1])  The jury found true a multiple victim enhancement in violation of Cal. Penal Code § 667.61(e).  (Doc. 13-2 at 116.)  On June 5, 2019, Petitioner was sentenced to an indeterminate term of 15 years to life, plus two consecutive indeterminate terms of 25 years to life for an aggregate term of 65 years to life.  (Doc. 13-2 at 114-123.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). (Doc. 13-8.)  On July 27, 2022, the Fifth DCA affirmed judgment.  (Doc. 13-8.)  On August 28, 2022, Petitioner filed a petition for review in the California Supreme Court.  (Doc. 13-9.)  The California Supreme Court denied the petition on October 19, 2022. (Doc. 13-9.)

On March 1, 2023, Petitioner filed a federal habeas petition in this Court.  (Doc. 1.)  On March 3, 2023, the petition was dismissed with leave to amend. (Doc. 5.)  On March 13, 2023, Petitioner filed a first amended petition. (Doc. 7.)  Respondent filed an answer to the petition on April 24, 2023. (Doc. 14.)  Petitioner did not file a traverse.

## II.    FACTUAL BACKGROUND[2]

Petitioner raped a young woman and committed lewd acts upon two separate children.

A.    Jane Doe 2

When Jane Doe 2 was about 24 years old, she had issues with her mother causing her to move out of the home they shared. Thereafter, Jane Doe 2 "stayed here and there . . . wherever I could lay my head."

Petitioner knew Jane Doe 2's mother and told Jane Doe 2 she could stay in one of his rooms. Jane Doe 2 stayed the night at Petitioner's place on perhaps two occasions. One of those times, she arrived at Petitioner's home at nighttime. She went to a room, closed the door most of the way, and went to sleep. Later, she woke up because Petitioner was having rough sex with her. Jane Doe 2 screamed. Petitioner grabbed her tighter and was moaning. Jane Doe 2 quickly put on her shorts and ran to the home of her child's father. She told him what had happened and called

---

[1] Docket citations refer to ECF pagination unless otherwise noted.

[2] The factual background is taken from the opinion of the Fifth DCA in People v. Arevalo, 2022 WL 2965965, at *1-3 (Cal. Ct. App. July 27, 2022), *review denied* (Oct. 19, 2022), and is presumed correct.

1    law enforcement.

2          On April 8, 2009, Sheriff's Deputy Barron was dispatched to Petitioner's address, after

3    Petitioner had called to report that someone was banging on his door and making death threats.

4    Petitioner did not open the door for the person and did not see who it was. Petitioner suspected it

5    was the father of Jane Doe 2's child. Petitioner claimed that Jane Doe 2 was his girlfriend.

6          Later that day, at about 8:50 a.m., Deputy Barron learned that another deputy was

7    investigating Jane Doe 2's rape allegation. Jane Doe 2 told Deputy Barron the suspect's name,

8    and it was the person he had met earlier that day (i.e., Petitioner). Deputy Barron returned to

9    Petitioner's residence to get additional statements. During this conversation, Petitioner "clarified

10   himself" and said that Jane Doe 2 was not his girlfriend, but rather just someone in whom he was

11   interested. Petitioner said she had been living with him for two weeks, and that the night before,

12   he had told Jane Doe 2 he wanted to bring over another woman to have sex. Jane Doe 2 became

13   jealous and the two had an argument. Petitioner claimed two other people were at his home that

14   night.

15         Petitioner stated that during that night, he entered Jane Doe 2's bedroom, pulled down her

16   pants and underwear, and began having intercourse with her. Petitioner stated Jane Doe 2 did not

17   say anything. Petitioner said that "[t]here was no action from her." Petitioner said he did not

18   obtain her permission; however, he believed the encounter was consensual because the door was

19   open, and he took that as a sign to enter. Based on Deputy Barron's recollection, Petitioner said

20   Jane Doe 2 was asleep, but eventually woke up and said something. Jane Doe 2 shouted, "What

21   are you doing?" She then got up and ran out of the house. Petitioner was cooperative during

22   Deputy Barron's interview.

23         B.      Jane Doe 3

24         Jane Doe 3 was born in May 2006. In 2015, Petitioner had a girlfriend named Alicia G.

25   Alicia's daughter and Jane Doe 3 were best friends, and would go to a nearby pool where users

26   were charged money to access it.

27         Alicia's daughter asked Jane Doe 3 to ask Petitioner for money to take to the pool. Jane

28   Doe 3 went upstairs into Petitioner's room and asked him for a few dollars. Petitioner said

something Jane Doe 3 could not understand and got close to her. Petitioner began touching and rubbing her "private parts"[3] over her clothes. She ran downstairs and went to her house. Jane Doe 3 did not go to the pool.

A couple of days later, Jane Doe 3 told her friend what had happened. Jane Doe 3 did not initially tell her mother what had happened.

Deputy Sanchez submitted a report to the district attorney's office. When asked what happened with the case, Deputy Sanchez testified that from what he could recall, "it wasn't enough" to go forward with a prosecution at the time.

C.    Jane Doe 4

Jane Doe 4 was seven years old when she testified at trial. Jane Doe 4 testified that her "third grandma" was "Grandma Alicia." Petitioner was Grandma Alicia's boyfriend.

When Jane Doe 4 was four or five years old, something bad happened at Petitioner's house. Her grandmother went to get pizza, but Jane Doe 4 stayed behind because she was watching her favorite movie. Jane Doe 4 was laying on a bed watching the movie when Petitioner began touching her "butt" under her clothes. Petitioner told her to turn around, and then began touching her "boobs" under her clothing. He also began rubbing her vagina – which she referred to as her "cookie" – under her clothes.[4] Jane Doe 4 told Petitioner to stop. After a little while, Petitioner stopped. Jane Doe 4 told her grandmother and mother what happened.

Jane Doe 4 subsequently told law enforcement about the incident in an interview on November 9, 2016. Jane Doe 4 told Deputy Sanchez that she did not like "Tigre," her grandmother's boyfriend, because he touched her butt. Tigre also touched her "cookie," while telling her to look at the movie. Jane Doe 4 could not push him away because he was holding her hands. Tigre also touched her "chi-chis" under her shirt. During the interview, Deputy Sanchez realized Jane Doe 4 was describing the same person as the suspect in Jane Doe 3's case.

Deputy Sanchez interviewed Jane Does 1, 2, and 4, in November 2016. Deputy Sanchez

---

[3] Jane Doe 3 also referred to this as her "middle." When asked if her "middle part" was the part she used to go to the bathroom, she responded, "Yes."

[4] Jane Doe 4 testified that she called the "private part" used to go "number one" in the bathroom a "cookie."

arrested Petitioner in December.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

5

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Cullen v. Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

6

In a case where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.     Review of Petition

Petitioner presents the following grounds for relief: 1) The trial court erred by instructing the jury on propensity evidence; 2) Counsel was ineffective in failing to object to the trial court's instruction on propensity evidence; 3) The trial court erred by denying Petitioner's Marsden motion and request for a new attorney; 4) Petitioner's sentence constituted cruel and unusual punishment, and the failure of Petitioner's attorney to object on said grounds constituted ineffective assistance; and 5) Petitioner's right against self-incrimination was abridged when he was interrogated while detained.

1.     Ground One

Petitioner first claims the trial court erred by instructing the jury on propensity evidence pursuant to Cal. Evid. Code § 352. This claim was raised on direct review in the state courts. In the last reasoned decision, the Fifth DCA denied the claim as follows:

**II. Evidence Code Section 352 Did Not Preclude Court's Propensity Instruction**

Defendant argues that the court should not have given the propensity instruction under Evidence Code section 352.

*Law*

Evidence Code section 352 grants trial courts the discretion to exclude evidence if its probative value is outweighed by the probability that its admission will create substantial danger of undue prejudice. (Evid. Code, § 352.) A trial court may consider Evidence Code section 352 factors when deciding whether to permit the jury to infer a defendant's propensity from other sex crimes evidence. (*Villatoro*, *supra*, 54 Cal.4th at p. 1163.)

*Analysis*

Defendant contends the evidence of the various sex crimes was "weak." With respect to count two, defendant observes that while "the State claimed that [Jane

7

Doe 2] had been sleeping when [he] entered the room and began intercourse with her while asleep, he stated that he went into the room just after she left his bedroom." However, it was not merely that "the State claimed" Jane Doe 2 had been sleeping – Jane Doe 2 testified to that effect at trial. And the fact that defendant offered an account that differed from Jane Doe 2's testimony in self-serving ways does not render the case weak.

Defendant also contends the district attorney's office failed to prosecute the crime against Jane Doe 2 for nine years "apparently recognizing some flaws of the claims made by [Jane] Doe 2." Defendant offers no record citation in support of this claim. [Fn.8] In any event, the case is not so weak as to fatally undermine its probative value. Jane Doe 2 directly testified to defendant's rape. And defendant himself said that he did not obtain her permission; based his belief that she consented on the fact that her door was open; and that Jane Doe 2 had shouted, "What are you doing?" before getting up and running out of the house. Whatever other factors defendant had in his favor, this evidence meant the case was not "weak."

> [Fn.8] In his reply brief, defendant cites to testimony that "the case fell through when it was handed to the District Attorney's Office." However, this testimony did not identify a reason for the lack of immediate prosecution. Defendant also cites to argument offered by the prosecutor to the effect that some of the charges were brought earlier because they were subsequently strengthened by propensity evidence. Even assuming the prosecutor's argument, which is not evidence, is relevant here, it did not indicate that Jane Doe 2's claims were "flawed."

As to Jane Doe 3, Deputy Sanchez did testify as to his recollection that the district attorney did not immediately prosecute the case because there was "not enough" to proceed with a prosecution. Assuming Deputy Sanchez's recollection was correct, and the district attorney's office indeed came to that conclusion at the time, it would not preclude a finding the evidence later adduced at trial was not weak. Indeed, Jane Doe 3 testified clearly and directly about defendant's crime. The defense did little to undermine her claims.

Defendant contends that the allegations regarding Jane Doe 4 were also weak. Not so. Defendant points to Jane Doe 4 saying he grabbed her "boobs." Defendant says her account in this regard is "a situation that is hard to imagine occurring since she was not at an age to have developed breasts subject to being grabbed." However, a reasonable inference favoring the judgment is that Jane Doe 4 was using the word "boobs" to describe a *location* on her body (i.e., her chest) rather than to suggest she had developed breasts at the time of the molestation.

Moreover, even if the prosecution's evidence was such that the propensity evidence was crucial to satisfying the beyond-the-reasonable doubt standard, it would not necessarily warrant exclusion of the propensity evidence. The entire point of Evidence Code section 1108 is to allow propensity evidence to affect a jury's verdict. It would completely undermine the core purpose of this statute to say propensity instructions are improper in all cases where the propensity evidence was essential to the jury's verdict. [Fn.9]

> [Fn.9] A jury's verdict may not rest *solely* on the propensity inference. But a jury's verdict is valid even if the propensity inference was material to the verdict. In other words, the fact that a jury would not have convicted without the propensity evidence does not render admission of the

1    propensity evidence improper.

2    Defendant also suggests that because Jane Does 3 and 4 both knew Alicia G., "it
     does not take much to infer that [Jane] Doe 4 may have been aware of the earlier
3    incident with [Jane] Doe 3." Even if this chain of inferences were accepted – a
     debatable assumption – it would do little damage to the prosecution's case. The
4    possibility Jane Doe 4 may have known of Jane Doe 3's incident does not render
     the case "weak."

5
     Defendant contends that there is a lack of evidence that an interest in minor girls is
6    common among those men who are active sexually with adult women, either
     consensually or otherwise. But the trial court was not required to view the crimes
7    at such a granular level of abstraction. The trial court could have reasonably
     concluded that the evidence supported an inference defendant has a propensity to
8    seek sexual gratification through nonconsensual means when an opportunity
     presents itself with a vulnerable female. As a result, the trial court could have
9    further concluded such evidence should go to a jury for consideration, along with
     the admonition that it was "only one factor to consider along with all the other
10   evidence" and that each charge still must be proven beyond a reasonable doubt.
     We see no error in the instruction permitting the jury to consider the propensity
11   evidence. [Fn.10]

12        [Fn.10] In his reply brief, defendant apparently challenges the instruction
          on grounds separate from Evidence Code section 352. He calls the
13        propensity instruction "contradictory." Momentarily assuming this
          contention is not forfeited, we conclude it is meritless. There is nothing
14        contradictory in telling the jury they may accept a propensity inference but
          that it is only one factor and that each crime must be proven beyond a
15        reasonable doubt.

16   Arevalo, 2022 WL 2965965, at *6-7.

17             a.      Legal Standard and Analysis

18        This claim is not cognizable on federal habeas review because the admissibility of

19   evidence is a matter of state law.  Estelle, 502 U.S. at 67-68 (state evidentiary ruling cannot

20   provide ground for federal habeas relief unless the admission of evidence violated due process).

21   In addition, Petitioner cannot show that the trial court's admission of propensity evidence was

22   contrary to or an unreasonable application of Supreme Court precedent pursuant to 28 U.S.C. §

23   2254(d), since there is no Supreme Court precedent governing a court's discretionary decision to

24   admit evidence as a violation of due process.  In Holley v. Yarborough, the Ninth Circuit stated:

25        Under AEDPA, even clearly erroneous admissions of evidence that render a trial
          fundamentally unfair may not permit the grant of federal habeas corpus relief if not
26        forbidden by "clearly established Federal law," as laid out by the Supreme Court.
          28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately
27        addressed a claim, this court cannot use its own precedent to find a state court
          ruling unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.

28
                                            9

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see also Moses v. Payne, 555 F.3d 742, 760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.  See generally, Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam); Jennings v. Runnels, 493 F. App'x 903, 906 (9th Cir. 2012); Bradford v. Paramo, No. 2:17-cv-05756 JAK JC, 2020 WL 7633915, at *6-7 (C.D. Cal. Nov. 12, 2020) (citing cases).

Even if the Court were to consider the claim, Petitioner would not be entitled to relief.  As noted by the state court, the propensity evidence was only one factor the jury could consider along with all other evidence, and the jury was so informed.  Moreover, the evidence of Petitioner's guilt, apart from the propensity evidence, was strong.  Petitioner admitted to having intercourse with Jane Doe 2 without her consent, and Jane Doe 2 also testified to Petitioner's actions.  Jane Does 3 and 4 also testified as to Petitioner's actions, while the defense offered little to challenge this evidence.

In conclusion, Petitioner fails to establish that the state court rejection of his claim was contrary to or an unreasonable application of Supreme Court precedent.  The claim must be denied.

2. Ground Two

Ground Two is essentially redundant of Ground One and Petitioner also alleges defense counsel rendered ineffective assistance by failing to object to propensity evidence.  The claim

lacks merit for several reasons.

As an initial matter, the claim is unexhausted. A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must first exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). Petitioner has not presented the claim to the state courts; therefore, it should be dismissed as unexhausted. Nevertheless, the failure to exhaust can be disregarded if the claim is meritless, as is the case here. 28 U.S.C. § 2254(b)(2).

Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). To prevail, Petitioner must first establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Petitioner must also establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed at trial. Id. at 694.

Petitioner has failed to make a showing that he satisfied either prong. First, counsel did challenge the introduction of propensity evidence in his *motions in limine*. (Doc. 13-1 at 175.) Counsel further argued that the charges should be severed due to the possible prejudice resulting from the evidence. (Doc. 13-4 at 84-85.) Second, Petitioner cannot demonstrate prejudice, because the trial court determined that the evidence could be introduced pursuant to state law. The claim will be denied.

3.      Ground Three

In his third claim, Petitioner alleges that the trial court erred in denying his motion for a new attorney. This claim was presented on direct review. In the last reasoned decision, the Fifth DCA denied the claim as follows:

**IV. Defendant Has Not Established Reversible Marsden or Sixth Amendment Error**

Defendant addressed the court at his sentencing hearing. Defendant said that, with respect to Jane Doe 4, he was no longer living at the address at which he was being accused of misconduct. He then said, "I would like to know what happened to my witnesses." Subsequent conversation clarified that he was referring to people who would know he did not live in the house at the time. Defendant said he gave the names of the people to his attorney.

Defendant then asked what happened to the report of defense investigator Serra.

11

Defense counsel said that he reviewed Serrano's investigation, and it "was a lot of speculation" and hearsay. No one had any "facts" that would "dispute any of the elements of any of the crimes."

The prosecutor observed that there were possibly two people in the house involving Jane Doe 2. One of them was named Jose with an unknown last name. The other one "had exculpatory evidence," and the prosecution tried to locate her. However, the prosecution believed she moved back to Mexico and could not be located.

The court observed that the prosecution witnesses' testimony indicated the incident at issue occurred when defendant was in a bedroom with the victim. Consequently, the court did not see how the testimony of any witnesses elsewhere in the house would benefit him.

The court advised defendant of his appeal rights. Defendant said he did want to appeal, but also wanted his attorney removed "because he did not help me." Upon that request, the court conducted a *Marsden* hearing.

At the outset of the *Marsden* hearing, the court informed defendant that if he convinced the court that defense counsel did not appropriately represent you, then he would be replaced. Alternatively, if defendant did not convince the court that he had received ineffective assistance of counsel, then his current counsel would remain.

Defendant said that, with respect to the incident involving Jane Doe 2, he had been injured by an accident in 2007. Yet, defense counsel did not introduce medical records indicating he injured his head and back. Defendant contended that while there was "supposedly ... aggressive force" used against the victim, he could not have done that in his physical state. Defendant also said he told counsel that he had paid Jane Doe 2 $120 for her "service" and that is one of the reasons he went to her room.

The court asked what else his counsel failed to do. Defendant told the court there was a "cover up in regards to evidence, because California law states that there has to be a victim and a witness – that there has to be two...."

Defendant also said he was bleeding internally during trial.

During trial, defendant asked counsel what happened with Serrano's investigation and counsel said, "[I]t was not necessary."

Defendant said Alicia G. was present in court but did not testify. Counsel told him she was "not available."

Defense counsel said he had no idea what defendant was talking about with regards to the medical records.

Counsel explained that the focus of Serrano's investigation was trying to formulate an explanation on how these four different females "combined to accuse him of sexual misdeeds." Counsel said it was a "daunting task" to "come up with" a reasonable explanation on how that could occur. Counsel explained to defendant that Serrano's investigation was not beneficial to his case.

Counsel observed that the fact other people were in the house during some of the

incidents was insufficient because he allegedly acted when he was alone with the victims.

Counsel said he evaluated Alicia G. as a witness, but she did not have any evidence to present that would have been beneficial.

The court denied the *Marsden* motion.

*Law*

When a defendant makes a *Marsden* motion, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of counsel's inadequacy." (*People v. Cole* (2004) 33 Cal.4th 1158, 1190.)

"Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge. The court does not abuse its discretion in denying a *Marsden* motion '"unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel."' [Citations.] Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when 'the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation].'" (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.)

*Analysis*

Defendant contends the court erred in denying the *Marsden* motion; erred in failing to appoint substitute counsel to, among other things, prepare a motion for new trial based on trial counsel's ineffective assistance; and violated his Sixth Amendment rights.

We find no error. The court permitted defendant to explain the grounds for the motion and to relate specific instances of counsel's allegedly inadequacy. And we see no basis for disturbing the court's subsequent determination that defendant had not carried his burden of showing substantial impairment to his right to counsel.

With respect to defendant's claim of exculpatory medical records, counsel indicated defendant did not tell him about any medical records. The trial court credited counsel's assertion, making a factual finding that defendant did not tell counsel about the medical records. Defendant says the court's conclusion had no "factual basis." But counsel's representation is the factual basis. To the extent there was a credibility question between defendant and counsel, the trial court was entitled to accept counsel's explanation.  (See *People v. Smith* (1993) 6 Cal.4th 684, 696.)

Defendant's focus on other people who were at the house where one or more of the alleged incidents occurred does not warrant reversal. He insists their testimony could have been helpful. However, counsel conveyed that any such people could not offer sufficiently valuable testimony because defendant committed the alleged acts while alone with the victims. While defendant clearly disagreed and believed it would be helpful for them to testify, "'[t]actical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict."'" (*People v. Myles, supra*, 53 Cal.4th at p. 1207.)

13

Defendant points to the prosecutor's statement about one of the witnesses having exculpatory evidence. Defendant observes that defense counsel did not indicate whether or not he made any effort to locate that witness. However, defense counsel indicated that people at the home who did not witness the actual crimes would not be able to provide helpful testimony. Defendant has failed to show this determination by counsel constituted ineffective assistance. Without citation to the record, defendant speculates the other household residents "could have supported his assertion that he had a legitimate expectation that having sex with [Jane] Doe 2 was consensual whether due to payment or other circumstances." This speculation is unpersuasive.

Defendant faults the court for not having Investigator Serrano testify or produce his investigative report which "may have" supported defendant's claims over counsel's. But counsel stated he considered Serrano's investigation and concluded it was not beneficial to the defense case. The trial court was entitled to accept counsel's explanation on a credibility basis without conducting additionally inquiry into leads that "may have" shown counsel was wrong. (See *People v. Webster* (1991) 54 Cal.3d 411, 436.)

Defendant argues that certain aspects of the probation report also establish ineffective assistance of counsel. However, that contention was not raised below and cannot be done so here for the first time. (Cf. *People v. Gay* (1990) 221 Cal.App.3d 1065, 1070 [principles of forfeiture apply to raising issue of substitute counsel on appeal when it was not raised below].)

Defendant says that counsel's assertion that he tried to question Jane Doe 2 about exchanging money for sex but was prevented by the prosecutor is not supported by the record on appeal. But this claim cannot establish ineffective assistance so as to have required substitution of counsel. An appellate court will not find ineffective assistance of counsel if there is even a *conceivable* reason for counsel's omissions. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) Assuming counsel in fact did not attempt to ask Jane Doe 2 about defendant's claim of prostitution, it is unclear whether or not there was a tactical reason for it. For example, counsel could have had reason to believe Jane Doe 2 would deny the alleged act of prostitution and that asking her the question would only have served to get unhelpful testimony before the jury. In sum, defendant has not established that any failure to question Jane Doe 2 in the manner he desired was actually ineffective assistance of counsel requiring substitution.

For these reasons we reject defendant's claim that the court violated his Sixth Amendment rights or erred in denying the *Marsden* motion or failing to appoint independent counsel to investigate claims of ineffective assistance.

Arevalo, 2022 WL 2965965, at *8-11 (footnotes omitted).

   a.  <u>Legal Standard and Analysis</u>

Petitioner challenges the trial court's denial of his motion for new counsel pursuant to

People v. Marsden, 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (1970).  As previously noted, the

interpretation and application of state laws are not cognizable on federal habeas.  Estelle, 502

U.S. at 67 (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)) ("We have stated many times that

14

1  'federal habeas corpus relief does not lie for errors of state law.'").  Petitioner contends the trial

2  court erred by failing to appoint new counsel post-conviction to investigate and prepare a motion

3  for new trial.  To the extent the claim concerns the interpretation and application of state law, it is

4  not cognizable on federal habeas review.  Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal

5  court may not issue the writ on the basis of a perceived error of state law").  Moreover, federal

6  courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877

7  F.2d 1395, 1399 (9th Cir.1989).

8      The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

9  enjoy the right to ... have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  The

10  Ninth Circuit has stated that the denial of a Marsden motion to substitute counsel can implicate a

11  criminal defendant's Sixth Amendment right to counsel and is properly considered in federal

12  habeas corpus, Bland v. California Dep't of Corrections, 20 F.3d 1469, 1475 (9th Cir. 1994), and

13  the Sixth Amendment requires an inquiry into the grounds for a motion to remove counsel.

14  Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000). However, the Sixth Amendment "does not

15  guarantee the right to appointment of a particular attorney, [citation], or the right to a 'meaningful

16  relationship' with that attorney."  Michaels v. Davis, 51 F.4th 904, 938 (9th Cir. 2022) (citing

17  Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624 (1989) and Morris v. Slappy,

18  461 U.S. 1, 14 (1983)).

19      The Ninth Circuit has found that a trial court's refusal to allow substitution of counsel can

20  violate a defendant's Sixth Amendment right to counsel if the defendant and his attorney have an

21  "irreconcilable conflict." Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007), cert. denied, 523

22  U.S. 1008 (2008). This level of conflict exists only if communication has so broken down that it

23  prevents the effective assistance of counsel. Id. at 886; Schell, 218 F.3d at 1026.  Nevertheless, a

24  defendant is not entitled to substitute counsel if the conflict is of his "own making," Schell, 218

25  F.3d at 1026, or if he refuses to cooperate with counsel "because of dislike or distrust" of counsel,

26  Plumlee v. Masto, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc).

27      Here, the trial court held a Marsden hearing at the sentencing hearing when Petitioner

28  complained of counsel's representation.  The trial court provided Petitioner the opportunity to

15

explain his reasons for wanting substitute counsel. The trial court then asked counsel to address

the alleged deficiencies and satisfied itself that counsel's representation was not inadequate.  The

record established that there was no breakdown of attorney-client communications or evidence of

any irreconcilable conflict.  Petitioner took issue with counsel's decisions whether to use a

defense investigator's report and whether to call certain witnesses, but "[d]isagreements over

strategical or tactical decisions do not rise to [the] level of a complete breakdown in

communication" that amounts to a Sixth Amendment violation.  Stenson, 504 F.3d at 886 (citing

Schell, 218 F.3d at 1026).  The factual record developed was sufficient to allow the court to make

an informed decision that petitioner's claim of conflict did not require substitute counsel. See

Stenson, 504 F.3d at 887 (inquiry was adequate when court determined lines of communication

were open and counsel was competent); United States v. Prime, 431 F.3d 1147, 1155 (9th Cir.

2005) (inquiry was adequate where defendant 'was given the opportunity to express whatever

concerns he had, and the court inquired as to [defense attorney's] commitment to the case and his

perspective on the degree of communication.")

In conclusion, it is clear from the record that the appellate court's decision was not

contrary to or an unreasonable application of Supreme Court precedent. The claim must be

denied.

4.     Ground Four

Petitioner next contends that his sentence constituted cruel and unusual punishment.  He

raised this claim on direct review as well.  In the last reasoned opinion, the appellate court

rejected the claim as follows:

> Defendant next contends his aggregate sentence of 65 years to life in prison
> violates constitutional prohibitions on cruel and unusual punishment.
>
> Defense counsel asked that the court run defendant's indeterminant sentences
> concurrently rather than consecutively, given defendant's lack of criminal record at
> the age of 40. The court ultimately sentenced defendant to a term of 15 years to
> life on count 2; a consecutive term of 25 years to life on count 5; a consecutive
> term of 25 years to life on count 6; and a stayed (§ 654) term of six years on count
> 3. Defense counsel did not object to the sentence pronounced by the court. On
> appeal, defendant now asserts the sentence pronounced by the court violate the
> Eighth Amendment to the federal Constitution and article I, section 17 of the
> California Constitution.

16

1

2

Defendant's challenges are forfeited because he failed to make an objection below. (See *People v. Gamache* (2010) 48 Cal.4th 347; *People v. Burgener* (2003) 29 Cal.4th 833, 886; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1247–1248.)

3

4

5

6

7

Defendant contends counsel's argument, that the court should impose concurrent rather than consecutive sentences, preserves a claim of cruel and unusual punishment. We fail to see how. Urging the court to exercise its discretion to impose concurrent rather than consecutive sentences is not the same as objecting to an aggregate sentence because it violates constitutional prohibitions on cruel and unusual punishment. The fact remains defendant forfeited these claims by "failing to articulate" an objection on constitutional grounds. (See *People v. Burgener, supra,* 29 Cal.4th at p. 886.)

8

9

10

11

Defendant cites to *In re Sheena K.* (2007) 40 Cal.4th 875, 887–889. However, *Sheena K.* was clear: "[W]e do *not* conclude that 'all constitutional defects ... may be raised for the first time on appeal, since there may be circumstances that do not present 'pure questions of law that can be resolved *without reference to the particular sentencing record developed in the trial court*.' (*Id.* at p. 889, italics added.) Here, defendant's claim of cruel and unusual punishment is clearly dependent on the sentencing record in the trial court.

12

13

Accordingly, we agree with the numerous cases that directly hold cruel-and-unusual-punishment challenges are forfeited when not raised below. (See *People v. Gamache, supra,* 48 Cal.4th 347; *People v. Burgener, supra,* 29 Cal.4th at p. 886; *People v. Speight, supra,* 227 Cal.App.4th at pp. 1247–1248.)

14

Arevalo, 2022 WL 2965965, at *13-14 (footnotes omitted).

15

      a.      Procedural Default

16

     The state court found that Petitioner had forfeited his claim by failing to make an

17

objection at sentencing on this basis.  A federal court will not review a claim of federal

18

constitutional error raised by a state habeas petitioner if the state court determination of the same

19

issue "rests on a state law ground that is independent of the federal question and adequate to

20

support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  This rule also applies

21

when the state court's determination is based on the petitioner's failure to comply with procedural

22

requirements, so long as the procedural rule is an adequate and independent basis for the denial of

23

relief.  Id. at 730.  For the bar to be "adequate," it must be "clear, consistently applied, and well-

24

established at the time of the [ ] purported default."  Fields v. Calderon, 125 F.3d 757, 762 (9th

25

Cir. 1997).  For the bar to be "independent," it must not be "interwoven with the federal law."

26

Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal

27

court may not consider it unless the prisoner can demonstrate cause for the default and actual

28

prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider

1    the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

2         The Ninth Circuit has repeatedly held that California's contemporaneous objection

3    doctrine is clear, well-established, has been consistently applied, and is an adequate and

4    independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002);

5    Vansickel v. White, 166 F.3d 953 (9th Cir. 1999).  Thus, by failing to object to the sentence as

6    cruel and unusual punishment, Petitioner waived his claim in state court and is procedurally

7    barred from raising it here.

8         In an attempt to avoid the procedural bar, Petitioner claimed that the failure to raise an

9    objection constituted ineffective assistance of counsel.  The appellate court rejected the claim

10    finding any objection by counsel would have been futile.  The appellate court found that

11    Petitioner's aggregate sentence of 65 years to life for three separate sex crimes against three

12    separate victims did not shock the conscience nor did it seem grossly disproportionate to the

13    severity of the crimes.  The court noted that Petitioner had raped a woman and molested two

14    vulnerable children.  As discussed below, the Petitioner's claim of cruel and unusual punishment

15    is meritless, and the state court reasonably determined that any objection would have been futile.

16                b.     Legal Standard and Analysis

17         The Eighth Amendment provides that cruel and unusual punishments shall not be

18    inflicted.  U.S. Const. amend. VIII.  A sentence constitutes cruel and unusual punishment if it is

19    "grossly disproportionate" to the crimes committed.  Lockyer v. Andrade, 538 U.S. 63, 71 (2003)

20    (holding that a California state court's affirmance of two consecutive twenty-five-years-to-life

21    sentences for petty theft was not grossly disproportionate and not contrary to nor an unreasonable

22    application of federal law); see also Ewing v. California, 538 U.S. 11 (2003) (holding that a

23    sentence of twenty-five-years-to-life for theft under California's three strikes law was not cruel

24    and unusual punishment); Harmelin v. Michigan, 501 U.S. 957, 961 (1991) (mandatory sentence

25    of life without possibility of parole for first offense of possession of 672 grams of cocaine did not

26    raise inference of gross disproportionality); Rummel v. Estelle, 445 U.S. 263, 271 (1980).

27         Outside of the capital punishment context, the Eighth Amendment prohibits only

28    sentences that are extreme and grossly disproportionate to the crime.  United States v. Bland, 961

1   F.2d 123, 129 (9th Cir.1992) (quoting Harmelin, 501 U.S. at 1001).  When reviewing an Eighth

2   Amendment claim in a federal habeas corpus petition, the gross disproportionality principle is

3   "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable

4   application of' framework" under 28 U.S.C. § 2254(d)(1). Lockyer, 538 U.S. at 73.  The "gross

5   disproportionality rule" applies "only in the 'exceedingly rare' and 'extreme' case." Lockyer,

6   538 U.S. at 72–73; Rummel, 445 U.S. at 272.  So long as a sentence does not exceed statutory

7   maximums, it will not be considered cruel and unusual punishment under the Eighth Amendment.

8   See United States v. Mejia-Mesa, 153 F.3d 925, 930 (9th Cir.1998); United States v.

9   McDougherty, 920 F.2d 569, 576 (9th Cir.1990).

10       In assessing the compliance of a non-capital sentence with the proportionality principle, a

11   reviewing court must consider "objective factors" to the extent possible.  Solem, 463 U.S. 277,

12   290 (1983).  Foremost among these factors are the severity of the penalty imposed and the gravity

13   of the offense.  Id. at 290–91.  If "a threshold comparison of the crime committed and the

14   sentence imposed leads to an inference of gross disproportionality," the reviewing court should

15   compare the sentence with sentences imposed on other criminals in the same jurisdiction and for

16   the same crime in other jurisdictions.  Harmelin, 501 U.S. at 1005.  "Comparisons among

17   offenses can be made in light of, among other things, the harm caused or threatened to the victim

18   or society, the culpability of the offender, and the absolute magnitude of the crime." Taylor, 460

19   F.3d at 1098.  If a comparison of the crime and the sentence does not give rise to an inference of

20   gross disproportionality, a comparative analysis is unnecessary.  Id.

21       The Court finds no inference of gross disproportionality from the present record.  As

22   noted by the state court, Petitioner was found to have raped a woman and sexually molested two

23   young children.    Nothing in the record creates an inference of gross disproportionality.

24   Accordingly, the state court determination that Petitioner's sentence did not constitute cruel and

25   unusual punishment was not contrary to or an unreasonable application of Supreme Court

26   precedent.  The claim should be rejected.

27       5.    Ground Five

28       In his final claim, Petitioner alleges that the admission of his statements made to police

violated his rights under Miranda v. Arizona, 384 U.S. 436 (1966), because he was subjected to

custodial interrogation.  Petitioner presented this claim on direct review as well, and it was denied

by the Fifth DCA as follows:

### V. Defendant Was Not in Custody for Miranda Purposes When He Gave Statements in Question

The court held an Evidence Code section 402 hearing on the admissibility of statements defendant made to police in 2009 regarding Jane Doe 2. Deputy Barron testified he responded to a call on April 8, 2009, at an address on Lilac Court. He responded to that address because defendant reported someone had been banging on his door and made threatening comments.

Deputy Barron asked defendant who he believed had made the threat. Defendant said Jane Doe 2 was his girlfriend and that it was probably "the boyfriend." Defendant said Jane Doe 2 had been staying with him for two weeks, and the two had gotten into an argument. Defendant asked Deputy Barron to "tell them not to come over."

Later that day, Deputy Venable asked Deputy Barron to meet him at an address in Wasco pursuant to an investigation occurring there. When Deputy Barron arrived, he contacted Deputy Venable and Jane Doe 2. Deputy Venable told Deputy Barron that he was investigating an alleged rape. Jane Doe 2 told Deputy Barron that defendant had raped her. Jane Doe 2 said that she had been living with defendant for two weeks. Jane Doe 2 said that she did not have an intimate relationship with defendant, and they were just roommates.

When Deputy Barron asked her about defendant's claims earlier that day, Jane Doe 2 said it was the father of her child who went to defendant's home.

Deputy Venable asked Deputy Barron to return to the address where he had spoken with defendant. When Deputy Barron arrived, defendant was not there. A woman identified herself as defendant's daughter. Deputy Barron had her call defendant and the two had a conversation.

Deputy Barron asked defendant, "[D]o you mind if I talk to you more about what happened this morning." Defendant returned to the home and invited Deputy Barron inside. The two spoke in defendant's living room.

Deputy Barron asked defendant about Jane Doe 2. Defendant initially said she was his girlfriend and was jealous – that was why she was "mad" at him. Later, defendant said that Jane Doe 2 was not his girlfriend, but rather a person with whom he *wanted* to have a relationship.

Deputy Barron asked defendant what had happened the night before. Defendant said he and Jane Doe 2 had an argument, and she went to her room to sleep. Defendant said that shortly after, defendant went to her room as well intending to have intercourse with her. Defendant said it was dark in the room because there was no electricity. Defendant said he pulled down Jane Doe 2's pants and underwear and put his penis in her vagina. Defendant said Jane Doe 2 never gave verbal consent for intercourse. However, he thought that because the door was open, it was a sign for him to enter and have intercourse with her. Jane Doe 2 woke up and said, "What are you doing?" She gathered her clothes and ran away.

Deputy Barron then arrested defendant. Deputy Barron was wearing his standard uniform, which includes a belt with a gun and handcuffs. However, prior to the time of the arrest, Deputy Barron had not handcuffed defendant nor had he drawn his weapon. Prior to the time of the arrest, Deputy Barron had not *Mirandized* defendant because he did not consider him to be in custody. Deputy Barron did not expressly tell defendant he could leave.

The court ruled that, "in considering the totality of the circumstances" defendant was not in custody. The court observed that defendant agreed to the interview, it occurred at his home, he was not told he was detained, the questioning was not done in an accusatory fashion, and there was nothing to indicate his freedom of movement was curtailed.

"*Miranda* requires that a criminal suspect be admonished of specified Fifth Amendment rights. But in order to invoke its protections, a suspect must be subjected to *custodial interrogation*.... [Citation.] Thus two requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" (*People v. Whitfield* (1996) 46 Cal.App.4th 947, 953.)

Custody means formal arrest or "a restraint on freedom of movement of the degree associated with a formal arrest." (*People v. Moore* (2011) 51 Cal.4th 386, 395.)

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave.'" (*People v. Moore, supra*, 51 Cal.4th at p. 395.)

Here, there was substantial evidence to support the trial court's conclusion the questioning occurred in a non-custodial context. As the court observed, defendant agreed to the interview in response to a noncoercive question. The interview occurred at his home and there was nothing to indicate to defendant his freedom of movement had been curtailed.

Defendant points to the fact that Deputy Barron did not inform him that he was not under arrest and could decline to answer questions. However, the right to decline to answer questions is one of the *Miranda* advisements. It would be circular to rely on the failure to give one of the *Miranda* advisements to conclude defendant was in custody, and, therefore, *Miranda* advisements were required. Moreover, such a holding would collapse the rule that *Miranda* advisements are not required before a defendant is in custody.

Additionally, Deputy Barron asked defendant, "Do you mind if I talk to you more about what happened this morning?" Though not an express advisement that the conversation was voluntary, this question conveyed voluntariness in a different way.

Defendant also notes that he was arrested after the interview concluded. But the statements admitted at trial were made before arrest. The fact that defendant was undoubtedly in custody *after* making the admitted statements does not establish

21

1    *Miranda* error.

2    Finally, defendant observes that he is Spanish-speaking and "may not be familiar
     with the procedures and/or rights afforded to persons in this country." However,
3    the fact someone is "Spanish-speaking" does not, by itself, support an inference
     they are unaware of legal rights. In any event, our inquiry is an objective one, not a
4    subjective one. (*People v. Macklem* (2007) 149 Cal.App.4th 674, 689–690.) The
     question is not whether defendant actually understood he was free to leave, but
5    whether the circumstances objectively indicated he was not free to leave.

6    Arevalo, 2022 WL 2965965, at *11-13.

7            a.      Legal Standard

8            The Fifth Amendment provides that "no person shall be compelled in any criminal case to

9    be a witness against himself."  A suspect subject to custodial interrogation has a Fifth

10   Amendment right to consult with an attorney, and the police must explain this right prior to

11   questioning.  Miranda v. Arizona, 384 U.S. 436, 469–73 (1966).  In Miranda, the United States

12   Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or

13   inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the

14   use of procedural safeguards effective to secure the privilege against self-incrimination."  384

15   U.S. at 444.  To this end, custodial interrogation must be preceded by advice to the potential

16   defendant that he or she has the right to consult with a lawyer, the right to remain silent and that

17   anything stated can be used in evidence against him or her.  Id. at 473-74.  These procedural

18   requirements are designed "to protect people against the coercive nature of custodial

19   interrogations."  DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).

20           "Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but

21   only in those types of situations in which the concerns that powered the decision are implicated."

22   Berkemer v. McCarty, 468 U.S. 420, 437 (1984).  Although "those types of situations" may vary,

23   they all share two essential elements: "custody and official interrogation." Illinois v. Perkins, 496

24   U.S. 292, 296–97 (1990).

25           Two distinct inquiries are essential to the Miranda custody test: "(1) the circumstances

26   surrounding the interrogation, and (2) given those circumstances, whether a reasonable person

27   would have felt free to terminate the interrogation and leave." Yarborough v. Alvarado, 541 U.S.

28   652, 653 (2004).  The inquiry focuses on the objective circumstances of the interrogation.  Id. The

court must determine whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." United States v. Beraun–Panez, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir.1987); see also United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001).  The Ninth Circuit has noted the following factors to be relevant to deciding that question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Hayden, 260 F.3d at 1066 (citing Beraun–Panez, 812 F.2d at 580).  "Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators; the Beraun–Panez/Hayden factors are simply ones that recur frequently."  United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

Error in admitting statements obtained in violation of Miranda is deemed harmless for purposes of federal habeas review unless the error "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002).

b.      Analysis

In this case, the Fifth DCA applied clearly established Supreme Court precedent. Therefore, the question for this Court is whether that application was unreasonable.  In light of the record, a rational jurist could conclude that the state court determination that Petitioner was not in custody at the time he made the incriminating statements was reasonable.

As noted by the state court, a significant number of factors weighed against a finding that the interrogation was custodial.  First, the officer contacted Petitioner by telephone and asked him, "[D]o you mind if I talk to you more about what happened this morning."  Although the officer initiated the contact, Petitioner was not at home, but he returned home and invited the officer into his house.  The interview did not take place in a police station or vehicle; instead Petitioner and the officer sat down in the living room at Petitioner's invitation.  There was only one officer present. He was courteous and polite and did not threaten or intimidate Petitioner.

23

1   Further, the officer never told Petitioner he was under arrest or not free to leave until after the

2   interview concluded.

3          Given the factors noted by the state court, a rational jurist could conclude that the

4   encounter was not so coercive that a reasonable person in Petitioner's circumstances would not

5   have felt free to end the interrogation.  See Hayden, 260 F.3d at 1066 (the defendant's "ability to

6   leave was [not] in any other way restrained," and "the duration of the interviews was [not]

7   excessive[and] undue pressure was [not] exerted"); United States v. Gregory, 891 F.2d 732, 735

8   (9th Cir.1989) (the defendant "consented to be interviewed . . . and no coercion or force was

9   used"); United States v. Hudgens, 798 F.2d 1234 (9th Cir. 1986) (the defendant voluntarily

10  entered a police car to talk to the police and the agents did not use intimidating or coercive

11  language during the interview).  Thus, the state court determination that he was not in custody

12  when he provided incriminating statements was reasonable.

13         Accordingly, Petitioner fails to demonstrate that the state court erred unreasonably in

14  finding that Petitioner's constitutional rights under Miranda were not violated. The claim will be

15  denied.

16         D.      Certificate of Appealability

17         A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

18  district court's denial of his petition, and an appeal is only allowed in certain circumstances.

19  Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003).  The controlling statute in determining

20  whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

21         (a)      In a habeas corpus proceeding or a proceeding under section 2255 before a district
22         judge, the final order shall be subject to review, on appeal, by the court of appeals for the
             circuit in which the proceeding is held.

23         (b)      There shall be no right of appeal from a final order in a proceeding to test the
             validity of a warrant to remove to another district or place for commitment or trial a
24         person charged with a criminal offense against the United States, or to test the validity of
             such person's detention pending removal proceedings.
25
           (c)      (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal
26                 may not be taken to the court of appeals from—

27                        (A) the final order in a habeas corpus proceeding in which the detention
                         complained of arises out of process issued by a State court; or
28

1          (B) the final order in a proceeding under section 2255.

2         (2) A certificate of appealability may issue under paragraph (1) only if the
  applicant has made a substantial showing of the denial of a constitutional right.

3
  (3) The certificate of appealability under paragraph (1) shall indicate which
4         specific issue or issues satisfy the showing required by paragraph (2).

5         If a court denies a petitioner's petition, the court may only issue a certificate of

6       appealability when a petitioner makes a substantial showing of the denial of a constitutional right.

7       28 U.S.C. § 2253(c)(2).  To make a substantial showing, the petitioner must establish that

8       "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have

9       been resolved in a different manner or that the issues presented were 'adequate to deserve

10      encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting

11      Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

12        Here, the Court finds that Petitioner has not made the required substantial showing of the

13      denial of a constitutional right to justify the issuance of a certificate of appealability.  Reasonable

14      jurists would not find the Court's determination that Petitioner is not entitled to federal habeas

15      corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Thus, the

16      Court declines to issue a certificate of appealability.

17      **IV.**  **ORDER**

18        Accordingly,

19      1.   The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

20      2.   The Clerk of Court is DIRECTED to enter judgment and close the case; and

21      3.   The Court DECLINES to issue a certificate of appealability.

22        This order terminates the action in its entirety.

23

24      IT IS SO ORDERED.

25      Dated:  **June 22, 2023**     _/s/ Sheila K. Oberto_

26                   UNITED STATES MAGISTRATE JUDGE

27

28